Kim STILLWELL, Plaintiff and Appellant,

v.

CINCINNATI INCORPORATED, Defendant and Appellee.

Civ. No. 10282.

Supreme Court of North Dakota.

July 14, 1983.

Dosland, Dosland & Nordhougen, Moorhead, Minn., for plaintiff and appellant; argued by Duane Lillehaug, Moorhead, Minn.

Lundberg, Conmy, Nodland, Lucas & Schulz, Bismarck, for defendant and appellee; argued by Patrick A. Conmy, Bismarck.

SAND, Justice.

The plaintiff, Kim Stillwell (Stillwell), appealed from a district court judgment dismissing with prejudice her personal injury action against the defendant, Cincinnati Incorporated (Cincinnati), in which she sought to recover damages for the loss of four fingers on her right hand, based upon the theories of strict liability in tort and negligence.

On 16 July 1979 four fingers on Stillwell's right hand were accidently severed by the "press brake" she was operating. The "press brake" was manufactured by Cincinnati and being used in the manufacturing process of her employer, Clark Equipment Co. (Clark), of Gwinner, North Dakota. A press brake is an industrial machine used to bend and shape metal by the application of force through a descending ram to a fixed bed. Tools and dies are inserted on the bed and lower edge of the ram to bend and shape the metal into the desired configuration. The "point of operation" of a press brake is the area of impact where the dies descend onto the metal with the force of the descending ram providing the shape to the metal inserted in the bed.

The press brake involved in the instant action was a general purpose press brake manufactured by Cincinnati in 1958 in response to an order by Clark. The press brake, as originally manufactured, was operated by the use of a mechanical clutch foot pedal to cause the ram to descend. The mechanical foot pedal required the operator to lift his or her foot nine to ten inches above the floor and apply approximately fifty pounds of pressure to depress the pedal fully to cause the ram to descend.

In approximately 1975 or 1976 the press brake was modified to provide two separate methods of causing the ram to descend, a foot switch and a two-hand palm button. Clark replaced the mechanical clutch foot pedal with an air electric clutch and foot switch which required only two pounds of pressure to operate the pedal, but was enclosed in a metal box which had a trapdoor across the front of the box requiring the operator to lift the trap door with his or her toe before the switch was accessible.

The two-hand palm button was an alternative method of operating the press brake and required the operator to use both hands to press separate buttons to operate the machine. The press brake stopped instantly if either hand was removed from one of the separate buttons.

The press brake was equipped with a key selector switch by which the owner could determine whether to use the electric foot switch control or the two-hand palm button control system. The electric foot switch and the two-hand palm button controls were essentially safety devices to allow operation of the press brake and at the same time prevent the ram from descending on the operator's hands.

Additionally, Clark had purchased another safety system for the press brake, an electric eye unit which would stop the ram at any point in its downward descent if anything broke the light beam in the point of operation. However, this safety system had not been installed by Clark.

On the day of her injury, Stillwell was operating the press brake to flatten strips of metal. Her foreman had selected the

foot control method of operation for the press brake rather than the two-hand palm control method. The particular foot control on this press brake did not have the trap-door cover which ordinarily had to be lifted before the switch could be activated. Thus the foot control was easily accessible without the normal safety precautions. Prior to the accident her foreman admonished her for not being more productive. Stillwell inadvertently tripped the foot switch while her hand was adjusting the metal part and, as a result, the ram descended on her right hand and severed four of her fingers.

Stillwell commenced an action against Cincinnati [1] alleging, in substance, that her injuries were the direct and proximate result of Cincinnati's negligent design, manufacture, distribution and servicing of the press brake; that the press brake was in a defective condition and unreasonably dangerous; [2] and that Cincinnati failed to give adequate and proper directions for use and warnings about the risks connected with the use of the press brake.

After a bench trial, the court entered judgment dismissing with prejudice Stillwell's complaint, and she appealed.

The first issue raised by Stillwell is that the trial court's finding that Stillwell's expert (Gerald Rennell) was not qualified to give opinion testimony as an expert witness was clearly erroneous and impermissibly tainted the court's view of the theories of recovery raised by her. In conjunction with this issue, Stillwell contended that the trial court's findings that the press brake did not have a design defect was clearly erroneous and the court erred by not finding that Cincinnati failed to adequately warn her of the danger inherent in the operation of the press brake. For purposes of discussion we will initially consider the trial court's finding that Rennell was not qualified to give opinion testimony as an expert witness.

■ Stillwell contended the trial court excluded Rennell's testimony from its consideration of her case because it erroneously found that Rennell was not qualified as an expert [3] and erroneously failed to take into account the factual basis supporting Rennell's claim to be an expert witness.

Rennell's deposition was read into evidence at trial, and his testimony essentially established his opinion as to various safety devices for press brakes. Rennell's testimony, in substance, suggested an interlocking "stroke-stop" safeguarding system which would have required either the two-hand palm control button or a "stroke-stop" method of operation using a foot control. A key interlocking device would then prevent the machine from being operated with anything but the "stroke-stop" method of dropping the ram whenever the foot option was used to run the machine. As described by Rennell, the press brake could be operated by dropping the ram to a quarter inch of

---

1. Stillwell did not institute an action against Clark because of the workmen's compensation law.

2. Stillwell's complaint used the term "reasonably dangerous."

3. In particular, Stillwell cited the following finding of fact:
"Gerald Rennel[l] is not qualified to give opinion testimony as an expert witness."
However, the trial court's memorandum opinion contained the following phrase to identify Rennell: "Mr. Rennel[l], an expert witness for the plaintiff, gave his opinion . . . ."
During oral argument we were informed that the reason for the discrepancy between the findings of fact and the memorandum opinion was that counsel for each party drafted a set of findings and submitted them to the court prior to the court issuing a memorandum opinion.

The findings submitted by Cincinnati were adopted by the court without any change. The trial court's memorandum opinion concluded with the following:
"Ordinarily, I would now direct the prevailing attorneys to prepare a proper order in keeping with my decision as set forth herein. However, since both sides have been so extremely helpful, and each having prepared a proposed Findings of Fact, Conclusions of Law, and Order for Judgment, I will advise that I have signed the Order prepared by the defendant without change, finding this to be in line with the Court's thinking as to how this case should be decided."
When there is a conflict between a memorandum decision and the findings of fact, the findings of fact govern. See, Hegge v. Hegge, 236 N.W.2d 910 (N.D.1975).

the metal in the bed with the palm control button and then positioning the metal and finishing the job with the foot control. According to Rennell, there would be no danger that the operator could have her hand in the point of operation because the size of the opening was reduced to such a degree that the hand would not fit in the opening.

The record reflects that Rennell's entire testimony, opinions and suggestions for safety devices for press brakes were admitted into evidence. Thus the precise issue presented by Stillwell does not deal with the admissibility of expert testimony, but rather with the weight and credibility to be attached to the expert's testimony.

A vast difference exists between qualifications of an expert (*i.e.*, whether or not a witness' knowledge, skill, experience, training, or education will assist the trier of fact to understand the evidence) which bears on the admissibility of the expert opinion, and the ultimate weight and credibility attributable to the testimony.

The trier of fact need not accept testimony and the opinion of an expert, even if the testimony is undisputed. *Cook v. Jacklitch & Sons, Inc.,* 315 N.W.2d 660 (N.D.1981); *State v. Collins,* 261 N.W.2d 878 (N.D.1977); *Waletzko v. Herdegen,* 226 N.W.2d 648 (N.D.1975). For example, a jury need not accept the opinion of an expert, but it may give the expert's opinion such weight as is reasonable in light of the factual circumstances. North Dakota Jury Instruction 1002. *See also,* 88 C.J.S. *Trial* § 203, p. 403, 408. The weight and credibility attributable to an expert's testimony and opinion is essentially a factual question for the trier of fact and the "clearly erroneous" standard of Rule 52(a), North Dakota Rules of Civil Procedure, applies.

The trial court found:

"41.

"The 'Rennel[l] interlock control system' is inappropriate as:

(a) The 1958 model machine was manufactured with mechanical controls—a foot pedal only—and electrical controls could not be fitted until the machine was converted to the air electric clutch in 1975 or 1976.

(b) A large number of usual press brake operations could not be performed using the Rennel[l] system.

(c) The Rennel[l] system would require the 'stroke stop' to be adjusted for each change in tooling and thickness of material being formed—with the probable result that the interlock would be permanently bypassed by setting the 'change over' at the top of the stroke—rather than just above the work piece."

We believe these findings of fact reflect that the trial court did consider the opinion and testimony of Rennell; however, the trial court found that the Rennell interlock control system was "inappropriate" because of the wide range of uses for the press brake which could not be performed using the Rennell system and because the interlock could be bypassed by changing the method of operating the ram at the top of the stroke rather than just above the piece of metal.

Although the particular wording of the finding of fact challenged by Stillwell may have been incorrect and misleading by itself, nevertheless the remaining findings reflect that the trial court did consider Rennell's testimony. Furthermore, we cannot totally ignore the circumstances leading up to the drafting of the findings of fact (see footnote 3) and the trial court's memorandum opinion. We conclude that the trial court did consider Rennell's testimony and opinion.

Having concluded that the trial court considered Rennell's testimony, we must next resolve whether or not the trial court's findings that the press brake did not have a design defect was clearly erroneous and if the court's failure to find that Cincinnati failed to adequately warn Stillwell of the danger inherent in the operation of the press brake constituted error.

In *Johnson v. American Motors Corporation,* 225 N.W.2d 57 (N.D.1974), this Court expressly adopted the rule of strict liability

in tort as set forth in § 402A, Restatement of Torts 2d, which provides as follows:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

■ Strict liability in tort cannot attach unless there is *proof of a defect* in the product arising out of its design or manufacture. *Herman v. General Irrigation Co.,* 247 N.W.2d 472 (N.D.1976). The requirement of an "unreasonable danger" is an integral part of the strict liability in tort doctrine in North Dakota. *Wilson v. General Motors Corp.,* 311 N.W.2d 10 (N.D.1981).

■ In *Johnson v. American Motors Corporation, supra,* we reversed summary judgments in two consolidated cases and remanded them for trial on the merits because factual issues remained concerning the duty of AMC to the user of its products and the events AMC was obligated to foresee. In *Herman v. General Irrigation Co., supra,* we reversed a trial court's finding that no engine defect existed and concluded that the finding was clearly erroneous. These cases make it clear that whether or not a manufacturer fits within the parameters of strict liability in tort is essentially a factual question for the trier of fact and the "clearly erroneous" standard of Rule 52(a), NDRCivP, applies.

A finding of fact of the trial court will be held clearly erroneous when the reviewing court, considering the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Gross v. Sta-Rite Industries, Inc.,* 322 N.W.2d 679 (N.D.1982). The mere fact that we might have viewed the facts differently if we had been the initial trier of the case does not entitle us to reverse the lower court. *In re Estate of Elmer,* 210 N.W.2d 815 (N.D.1973).

In this instance the trial court made the following pertinent findings of fact:

"22.

"The machine and its controls functioned properly before and after the accident.

. . . . .

"26.

"After O.S.H.A. standards were adopted in the 1970's, Cincinnati had furnished warning signs to all known owners of Cincinnati press brakes. The signs were either aluminum plates which fastened to the machine with screws, or were plastic 'stick ons.' Clark Equipment elected to use the 'stick ons.' At the time of the accident, the large 'DANGER' sign had been partially scratched off, and the text below the word 'Danger' was difficult to read. The yellow and black sign reading:

CAUTION

KEEP HANDS OUT OF DIE AREA

was in good condition.

. . . . .

"28.

"During the 1970's, Cincinnati made a series of mailings to Clark Equipment, which included:

(a) Advice on the A.N.S.I. B11.3 standards, requiring users to provide 'point of operation' guards;

(b) Advice on O.S.H.A. regulations, requiring users to provide point of operation guarding and warning signs;

(c) Warning signs for use on the machines;

(d) Operating and safety manuals for press brakes;

(e) Literature describing all developed types of point of operation safeguarding, including 'pull backs,' 'restraints,' 'barriers,' 'die guards,' 'auto feeds,' '2 hand palm buttons,' and 'presence sensing devices.'

(f) An offer to come to the plant and conduct operator safety training courses for the operators of press brakes and metal shears."

"31.

"General purpose press brakes are used for such a wide variety of parts and purposes, with such a wide variety of tools and dies, that there is no single effective safety device possible.

.    .    .    .    .

"33.

"The 2-hand palm buttons, in the operation being performed by Kim Stillwell, are the best safety device for such operation, and their use would have prevented the accident from occurring.

.    .    .    .    .

"36.

"At the time of the accident, the press brake was equipped with an appropriate point of operation safeguard and with warning signs.

.    .    .    .    .

"42.

"The plaintiff's claimed basis for liability is:

(a) Strict liability—a claim that the product was defective, unreasonably dangerous, and caused injury because of the defect. The claimed defects are the lack of an interlocked control system and lack of warning signs. The evidence shows that the machine was converted from mechanical to air electric controls by Clark Equipment Co., was equipped with warning signs, and was equipped with the appropriate

safety device—a 2 hand palm button control.

(b) Negligent design, manufacture and distribution. The evidence is uncontradicted that a machine identical in design and manufacture to the 1958 machine could be produced today, and it would be in compliance with the A.N. S.I. B11.3 and O.S.H.A. standards.

(c) Negligence in inspection, maintenance, repair, and failure to warn of dangers inherent in the use of the machine. The evidence shows that from 1971 on, Cincinnati furnished technical and safety manuals, warning signs, operator safety bulletins for posting, and information on safeguarding devices; and offered to put on operator safety training for Clark-Melroe employees."

"43.

"The proximate causes of the accident were the failure of Kim Stillwell Rath to follow the instructions given to her by Dennis Nelson, and her failure to pay attention to her job; and the failure of Dennis Nelson to switch the control mode to the 2 hand palm button control, which would have made the accident impossible."

█ Additionally, the trial court's memorandum opinion, which may be used to clarify and provide a clear understanding of the trial court's findings of fact [see, *Beneficial Finance Co. of Jamestown v. Lawrence,* 301 N.W.2d 114 (N.D.1980); *Diemert v. Johnson,* 299 N.W.2d 546 (N.D.1980)], in substance, found that the warnings given by Cincinnati were sufficient and not defective and, further, that the press brake was not unreasonably dangerous.

█ Except for Rennell's testimony and opinion of safety devices for the press brake which the trial court found inappropriate Stillwell has not demonstrated how these findings are clearly erroneous. Taking into account the trial court's assessment of Rennell's testimony, the weighing of the factual circumstances present in this case, and our standard of review of factual questions, we are not left with a definite and firm convic-

tion that a mistake has been made and we conclude that the trial court's findings on the issues of design defect and adequate warning are not clearly erroneous.[4]

Stillwell also contended that the trial court misapplied the "open and obvious danger" doctrine in a manner which effectively barred her claim.

However, the discussion referred to by Stillwell in the trial court's memorandum opinion makes it clear that the trial court initially found that there was no defect in the press brake because of a lack of warning and then commented on the "open and obvious danger" doctrine.

The memorandum opinion provides as follows:

"As far as the matter of warning is concerned, there is also no defect in this respect. Clark was aware of the hazard involved with this machine but did little, if anything, about it. Plaintiff [Stillwell] admitted that she also was aware of the danger. If it were not for such knowledge on the part of both these parties, then it could be successfully argued that there was a defect by reason of lack of warning. However, as pointed out herein, there was sufficient warning so there was an awareness based on both counts. There can be no defect where there is awareness or knowledge and, going further, there is then no duty to warn when a danger is obvious to the user."

Within the context of this paragraph it is apparent the trial court had previously found that there were sufficient warning signs on the press brake so as to preclude the press brake from being defective because of a lack of warning and, additionally, concluded there was no duty to warn when the danger was obvious to the user. Be-

cause the trial court initially found that the warning signs were sufficient, we do not believe it is necessary to consider the additional statements by the trial court concerning the open and obvious danger doctrine.

The remaining issues raised by Stillwell relate to the trial court's findings on the issues of negligence and proximate cause. These issues are factual questions and unless reasonable minds could draw but one conclusion, the findings of fact will not be set aside unless they are clearly erroneous pursuant to North Dakota Rule of Civil Procedure 52(a). *Bauer v. Graner*, 266 N.W.2d 88 (N.D.1978); *Miller v. Trinity Medical Center*, 260 N.W.2d 4 (N.D.1977).

We do not believe reasonable minds could draw but one conclusion on these issues. Further, we are not left with a definite and firm conviction that a mistake has been made on these issues and we conclude that the trial court's findings on these issues are not clearly erroneous.

The district court judgment is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.

---

4. Stillwell also urged this Court to adopt the "risk-benefit" analysis set forth in *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978) to determine whether or not a product is defective. Stillwell's argument concerning the risk-benefit analysis relied heavily upon Rennell's testimony. Because of our earlier conclusion concerning Rennell's testimony, we do not believe it is necessary to specifically adopt or reject the

"risk-benefit" analysis. Furthermore, the trial court, in its memorandum opinion, which may be used to explain or clarify findings of fact, found that the press brake was not unreasonably dangerous and that Stillwell did not carry her burden of proof to recover under strict liability. We do not believe the factual situation presented by the instant case established a defective product under the "risk-benefit" analysis.